IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

Brandon Pariscoff and
Kathleen B. Barthel,

        Plaintiffs,

v.

JPMorgan Chase Bank, N.A.,

        Defendant.

Case No. 2:11-cv-258

Judge Graham

Magistrate Judge Abel

OPINION AND ORDER

This matter is before the court on a motion for summary judgment pursuant to Fed. R. Civ. Pro. 56© filed by defendant JPMorgan Chase Bank, N.A. (Chase). Doc. 29. The Second Amended Complaint (doc. 42) brought by plaintiffs Brandon Pariscoff and Kathleen B. Barthel includes four counts: Count I alleges that Chase engaged in an unconscionable attempt to collect a debt in violation of the Colorado Consumer Credit Code; Counts II and III allege that Chase intentionally invaded each plaintiff's privacy; Count IV alleges that Chase converted plaintiff Pariscoff's vehicle to its own use. Doc. 42 at 4-6. Chase seeks summary judgment on each count. Doc. 29. Plaintiff Brandon Pariscoff was the debtor and plaintiff Kathleen Barthel was at relevant times his roommate in a home that they jointly owned.

**I.     Factual Background**

This case arises from defendant's attempts to collect on a debt allegedly owed by plaintiff Brandon Pariscoff. In July of 2008, Pariscoff purchased a 2008 Ford Mustang. Pariscoff Deposition, doc. 29-1 at 4. He financed a portion of the price of the vehicle, $31,600, with the auto dealer from which he purchased the car in Grand Junction, Colorado. Doc. 29-1 at 4; Pariscoff Declaration, doc

34-2 at 1.  The original lender subsequently assigned the loan to defendant Chase.  Doc. 34-2 at 1.

Pariscoff has presented deposition testimony that approximately four months after he purchased the vehicle, he received a call from Chase in which a representative described a payment-assurance plan.  According to Pariscoff, the plan he was offered would "ma[ke] my payments if I became involuntarily unemployed.  I accepted the offer on the call, authorizing the representative to add the premium to my account on a monthly basis."  Doc. 34-2 at 1.  Pariscoff testified that the representative told him that the plan would be "immediately available" and that Chase would send documents for his signature.  Doc. 29-1 at 5.  "I was not informed that 'To be eligible for Chase Payment Assurance', I was required to be employed at the time of the Plan Effective Date and for 90 days thereafter.  At the time I signed up I was never given such terms as part of the offer nor even asked if I was employed."  Pariscoff Declaration, doc. 34-2 ¶ 11.  Sometime in "early 2009" Pariscoff remembers receiving plan-related documents to sign.  Doc. 29-1 at 6.  Pariscoff testified that later in 2009 he received a purchase form, signed and returned it.  Doc. 29-1 at 9.  However, he was unsure of when that was.  "I signed it when I attempted to use my benefits sometime in 2009.  I want to say July."  Doc. 29-1 at 9.

Pariscoff became involuntarily unemployed when he was laid off on February 16, 2009.  Doc. 29-1 at 43.  This involuntary employment came some months after the phone call in which Pariscoff accepted enrollment in the plan.  After he lost his job, Pariscoff called Chase and "requested an activation of my benefits for–because I was now unemployed, and they said, 'Okay.  You're activated, and we're going to send you some information.'"  Doc. 29-1 at 11.  Pariscoff believes that he made that call around May 5, 2009.  Doc. 29-1 at 12.  Pariscoff testified that within a week of that call, he received materials that he was to sign and return to Chase.  According to Pariscoff, he did

2

not intend to use the payment assurance benefit at that point, even though he had become unemployed, but he "wanted my packet so I could continue to make payments on my savings." Doc. 29-1 at 13. Pariscoff claims that he called chase because he wanted to have the payment assurance plan, in which he had enrolled, available, so that if he did not get another job, or could not make payments from his savings, he could easily activate the benefit. Doc. 29-1 at 14.

According to his testimony, plaintiff subsequently did try to activate the payment assurance benefit. When he did so, he discovered that "there was an accounting error somewhere on Chase where they forgot to add [the payment assurance plan] to the bill, or add it to the account. I guess it was coding." Doc. 29-1 at 15. There is some dispute as to what happened around this time. Chase has presented a letter that it sent Pariscoff on May 05, 2009, stating that "We received a request to activate Chase Payment Assurance benefits, and have enclosed an activation form that must be completed and returned." Doc. 29-1 at 87. At this point, Pariscoff was unemployed. He signed a "Chase Payment Assurance Purchase Form" and dated it July 13, 2009. Printed on the form is a "Plan Effective Date" of February 18, 2009. Doc. 29-1 at 88. Though it appears that Pariscoff did not sign the purchase form until July of 2009, Chase has presented a letter dated May 27, 2009, that indicates that "Your Chase Payment Assurance fee is sixty (60) days or more past due," and that the payment assurance account was canceled as of February 18, 2009. Doc. 29-1 at 89. Pariscoff testified that he did not receive this letter until sometime in 2010 when it was produced to his attorney. Doc. 29-1 at 18. Apparently, between the time when Pariscoff received the original call offering him the payment assurance plan in late 2008 and when he called and requested "activation" of his benefits, Pariscoff believed that he was making payments toward the plan, but never saw documents that would confirm or deny such payments because he had opted out of receiving paper

statements and never viewed electronic statements. Instead, he simply called Chase to make his monthly payment. Doc. 29-1 at 21-23.

Pariscoff testified that during the time period when he thought he was covered under the payment assurance plan, he did not call to make payments. "I didn't need to. I knew my payment was made because I made the phone call and I had a verbal authorization over the phone." Doc. 29-1 at 22. It is unclear what time period he is talking about because he did, in fact, make payments throughout most of 2009. Chase presents a number of account statements that show that Pariscoff missed a payment due on February 8, 2009, and accrued a past-due balance at that point. Doc. 29-1 at 92. The statements show that he then made (at times late) payments due in March, April, May, June, July, August, and September of 2009. Doc. 29-1 at 90-107. During this time he remained one payment behind. Doc. 29-1 at 106. On October 13, 2009, Pariscoff made a payment that was subsequently reversed, according to Chase for insufficient funds, though the statement does not state the reason for the payment reversal. Doc. 29-1 at 108. He did not make a payment due on November 8, 2009. Doc. 29-1 at 110. It appears that Pariscoff attempted to pay the entire past-due amount on his loan on November 20, 2009, but that the payment was subsequently reversed. Doc. 29-1 at 112. At that point, plaintiff had a past-due amount of $2,523.36. Doc. 29-1 at 112. Chase claims that plaintiff made no further payments on the loan. Doc. 29 at 7.

Beginning in May of 2009, after Pariscoff first fell behind on his payments in February of 2009, Chase engaged in a process of attempting to collect on the debt. According to Chase, "when Pariscoff was behind on his loan payments, Chase undertook permissible collection efforts" including "telephone calls and attempted telephone calls . . . ." Doc. 29 at 12. According to Pariscoff, the number of calls that Chase made was "tremendous." Doc. 34-2 ¶ 4.

In its motion, Chase makes five assertions about these telephone calls: 1) "Calls were only attempted to Pariscoff's authorized home and cell phone numbers, and no others." 2) "Chase never contacted a number belonging to Barthel, although she occasionally answered Pariscoff's phone." 3) "No call occurred earlier than 8:00 a.m., or later than 8:45 p.m." 4) "The maximum number of attempted calls on any given day was 7, almost always fewer." 5) Calls were not attempted every day or even close to it." Doc. 29 at 12-13. Chase offers two call logs and the testimony and declaration of Andy Sulfsted, Operations Manager for the National Recovery Group at Chase, in order to support its claim that the calls made to Pariscoff were reasonable. One of the call logs (Exhibit A in doc. 29-3) is a log of calls initiated by either a live dialer or by Pariscoff. The other (Exhibit B in doc. 29-3) is a log of calls initiated by an automated dialer. Doc. 43 at 13.

Three of the five assertions made by Chase regarding its calling campaign are directly contradicted by the automated dialer call log or otherwise appear to be false, albeit in relatively minor ways. Chase asserts that it only called Pariscoff's authorized home number and cell phone numbers, and no others. Doc. 29 at 12. The log lists calls to three numbers identified as "Primary Home Phone," "Primary Work Phone," and "Maker Cell Phone." Doc. 29-3 at 24-35. Chase asserts that it "never contacted a number belonging to Barthel, although she occasionally answered Pariscoff's phone." Doc. 29 at 13. Yet, one of the numbers repeatedly called is identified as "Primary Home Phone," and during much of the relevant time period, the plaintiffs lived together in a home that they jointly owned. See Barthel Deposition, doc. 29-2 at 6. Chase asserts that all calls were between the hours of 8:00 a.m. and 8:45 p.m, the call log supports this assertion. Doc. 29 at 13. Chase asserts that the "maximum number of attempted calls on any given day was 7, almost always fewer." Doc. 29 at 13. Yet the call log reveals that on nine different days, Chase

5

attempted to call Pariscoff eight times.  The log does not record more than eight calls on any day.  Doc. 29-3 at 24-35.  Chase asserts that "[c]alls were not attempted every day or even close to it." Doc. 29 at 13.  The call log records calls made 301 calls on 62 different days between July 2, 2009 and November 9, 2009, a period of 130 days.

According to Pariscoff, when he "picked up the telephone he regularly reminded Chase that he had Chase Payment Assurance and that Chase needed to talk to his lawyer . . . .  Notwithstanding that, Chase continued with its ordinary telephone practices for about eight months."  Doc. 34 at 5.  Indeed, the majority of the calls in the logs provided by chase were made between July of 2009 and February of 2010.  Plaintiffs Pariscoff and Barthel found these calls to be very annoying.  Doc. 34 at 6.  "[B]oth were very highly distressed because Chase refused to just call Pariscoff's lawyer and resolve the dispute over the payment assurance by settlement or in Court."  Doc. 34 at 6.  "Pariscoff became obsessed with seeking justice for what Plaintiffs believed were outrageous 'above the law' actions."  Doc. 34 at 6.

Ultimately, the car was repossessed and resold.  Sulfsted Decl., doc. 29-3 ¶¶ 14-15.  Though at least one of the claims focuses on the repossession of the vehicle, neither party provides or directs the court to facts relevant to that repossession.  Plaintiffs summarily state that the "vehicle was repossessed; Plaintiff claims this repossession was despite his right to possession.  There is a factual dispute."  Doc. 34 at 8.

This is not the first lawsuit that plaintiff has filed regarding the repossession of his automobile. Chase claims and plaintiffs acknowledge that previous litigation in Colorado disposed of some of the claims presented by plaintiffs in their initial complaint.  Plaintiffs have since filed a second amended complaint, and defendants have not argued that any of the claims made in that

pleading are barred by preclusion.

Plaintiffs' second amended complaint brings four counts: Count I alleges that Chase violated the Colorado Consumer Credit Code, COLO. REV. STAT. § 5-5-109, by unconscionably attempting to collect a debt; Counts II and III allege that Chase invaded each plaintiff's privacy by intentionally and substantially intruding "into Plaintiff's seclusion done in ways that would be highly offensive to the ordinary person." Doc. 42 ¶¶ 14, 17. Count IV for conversion alleges that Chase "exercised unlawful dominion and control of the vehicle . . . ." Doc. 42 ¶ 20.

## II.  Legal Standard

Under Federal Rule of Civil Procedure 56, summary judgment is proper if the evidentiary materials in the record show that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Longaberger Co. v. Kolt, 586 F.3d 459, 465 (6th Cir. 2009). The moving party bears the burden of proving the absence of genuine issues of material fact and its entitlement to judgment as a matter of law, which may be accomplished by demonstrating that the nonmoving party lacks evidence to support an essential element of its case on which it would bear the burden of proof at trial. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Walton v. Ford Motor Co., 424 F.3d 481, 485 (6th Cir. 2005).

The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis in original); see also Longaberger, 586 F.3d at 465. "Only disputed material facts, those 'that might affect the outcome of the suit under the governing law,' will preclude summary judgment." Daugherty v. Sajar Plastics, Inc., 544 F.3d 696, 702 (6th Cir. 2008) (quoting Anderson,

477 U.S. at 248). Accordingly, the nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts." Moore v. Philip Morris Cos., Inc., 8 F.3d 335, 340 (6th Cir. 1993).

A district court considering a motion for summary judgment may not weigh evidence or make credibility determinations. Daugherty, 544 F.3d at 702; Adams v. Metiva, 31 F.3d 375, 379 (6th Cir. 1994). Rather, in reviewing a motion for summary judgment, a court must determine whether "the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 251-52. The evidence, all facts, and any inferences that may permissibly be drawn from the facts must be viewed in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Eastman Kodak Co. v. Image Technical Servs., Inc., 504 U.S. 451, 456 (1992). However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Anderson, 477 U.S. at 252; see Dominguez v. Corr. Med. Servs., 555 F.3d 543, 549 (6th Cir. 2009).

**III. Claims Based on Telephone Calls**

Three of plaintiffs' four counts are based in part or entirely on phone calls placed by Chase in an attempt to collect on Pariscoff's automobile loan. Counts II and III allege invasion of privacy based entirely on the phone calls, and Count I alleges a violation of consumer protection law that is based in part on the calls that Chase made to Pariscoff.

Plaintiffs deny that the efforts were "permissible" and characterize them as "harassment," but do not dispute Chase's claim that it placed "slightly over 300 calls." See doc. 34 at 5. Doc. 29-3 at 24-35. Plaintiffs assert one other problem with Chase's calling campaign. "When Pariscoff

8

picked up the telephone he regularly reminded Chase that he had Chase Payment Assurance and that Chase needed to talk to his lawyer . . . ." Doc. 34 at 5 (citing Pariscoff Declaration, doc. 34-2 ¶ 4).

Plaintiffs' first count alleges that Chase's pattern of calling Pariscoff was an unconscionable attempt to collect a debt. The Colorado Uniform Consumer Credit Code prohibits "unconscionable conduct in collecting a debt . . . ." COLO. REV. STAT. § 5-5-109(2). Courts are to consider several, non-exclusive factors in determining unconscionability, including whether the collector has "[c]ommunicat[ed] with the consumer or a member of the consumer's family at frequent intervals or at unusual hours or under other circumstances so that it is a reasonable inference that the primary purpose of the communication was to harass the consumer." COLO. REV. STAT. § 5-5-109(4)(b).

Plaintiffs' privacy claims are analyzed under a similar framework. Under Colorado law, "when *unreasonable action* in pursuing a debtor is taken, which foreseeably will probably result in extreme mental anguish, embarrassment, humiliation or mental suffering and injury to a person possessed of *ordinary sensibilities*, under the same or similar circumstances, then such conduct falls within the forbidden area and a claim for invasion of privacy may be asserted." Rugg v. McCarty, 476 P.2d 753, 755 (Colo. 1970) (emphasis in original).

The parties agree that there are few Colorado cases that describe when a telephone campaign becomes either an unconscionable debt collection practice under the Uniform Consumer Credit Code or an unreasonable action in violation of a plaintiff's right to privacy. In Rugg, the Supreme Court of Colorado held that the plaintiff had stated a claim for invasion of privacy by alleging that the defendant collector had "repeatedly harassed her with numerous telephone calls and letters," and had written to her employer "stating that she was not living up to her obligations . . . and inquiring concerning how many garnishments would be tolerated." Id. at 754. In the only other factually

similar decision by a Colorado court identified by the parties, the 21st District Court of Mesa County, Colorado denied a collector's motion for summary judgment on an invasion of privacy claim. U.S. Bank, N.A. v. Christenson, No. 10CV4233 (Col. Dist. Ct., Mar. 29 2011). The invasion of privacy claim was based solely on a campaign of phone calls, "often three or more times a day," over a three year period in which the debtors estimated that they received over 1000 calls. Id. at 8. The court held that this pattern of calls supported the invasion of privacy claim: "A reasonable fact-finder could find that the volume of calls Defendants describe, relentlessly continued in the face of Defendants' pleading, could constitute 'a course of hounding' that would be 'a substantial burden' to reasonable persons in Defendants' positions." Id.

In the absence of clear Colorado law, the parties direct the Court to cases from other jurisdictions. Of particular relevance may be cases from other states that interpret the approach to invasion of privacy adopted by the Restatement (Second) of Torts, an approach that has been discussed favorably by the Supreme Court of Colorado. See Denver Pub. Co. V. Bueno, 54 P.3d 893, 895-96 (Colo. 2002) (not considering invasion of privacy by a debt collector or by a campaign of telephone calls). Per the Restatement, "The right of privacy is invaded by (a) unreasonable intrusion on the seclusion of another . . . ."

In a case decided by the District of Kansas, the court identified a similar problem as arises in this case: "Kansas courts have seldom addressed privacy claims in the context of collection efforts and therefore the contours of this tort remain somewhat vague." Lowe v. Surpas Res. Corp., 253 F.Supp.2d 1209, 1237 (D. Kan. 2003). That case was factually similar to the one at hand:

> The issue before this court is whether a reasonable juror could find that [the defendant's] contacts exceed the bounds of reasonableness. Defendant argues that its contacts were not unreasonable, as a matter of law, because [defendant] never actually contacted [plaintiff] more than twice in a day and never contacted her before

> 8:30 a.m. or after 8:45 p.m. Moreover, [defendant] notes that it never attempted to contact [plaintiff] more than three times in a single day. Likewise, [defendant] appears to have attempted to reach [plaintiff] less than 10 times over a three month period and only spoke to her on two occasions. On the other hand, [defendant] directly contacted [plaintiff] on at least 20 separate occasions. [Defendant] also sent [plaintiff] collection letters on four separate occasions during this same time period. The defendants made these contacts despite [plaintiff] and other family members' continued attempts to dispute the validity of the debt. . . .
>
> The court does not believe that these contacts do not, as a matter of law, exceed the bounds of reasonableness. Based on the frequency of the contacts, the continued attempts to dispute the debt, and the requests that [defendants] cease their collection efforts, the court believes summary judgment would be improper.

253 F.Supp.2d at 1237-38. The calls at issue in Lowe were notably less frequent, and involved a smaller total number of calls, and far fewer attempted calls per day (a maximum of three rather than a maximum of eight). Similarly, in Duncan v. JP Morgan Chase Bank, N.A., the Southern District of West Virginia considered a case in which the defendant, in seeking to collect on an automobile loan, placed 68 calls (or more than 100 calls according to the plaintiff) to the plaintiff over an eleven month period. No. 5:10-cv-1049, 2011 WL 5359698, at *4 (S.D. W.Va. Nov. 4, 2011). The court held that the 68 calls admitted by defendant constituted a sufficient volume to create a jury question regarding wether the invasion of privacy "would be highly offensive to a reasonable person." Id. at *6. Here, the same defendant placed more than four times as many calls in slightly more that one-third of the time period.

Nonetheless, Chase argues that the two cases discussed above "are in the apparent minority" and that most other courts have held that high call volume alone is not enough to support an intent to harass, but that some other evidence of intent is required. As an initial matter, it appears that this argument would only apply to the Consumer Credit Code Claim, not the invasion of privacy claim. The former requires an intent to harass, the latter, on the other hand, requires only that unreasonable action "foreseeably will probably result in extreme mental anguish, embarrassment, humiliation or

11

mental suffering and injury to a person possessed of *ordinary sensibilities . . . .*" Rugg, 476 P.2d at 755 (emphasis in original).

The district court in Duncan refused to require more than a high volume of calls to demonstrate intent under a state statute that did require such intent. "Placed in the proper context, the volume of calls made to a debtor can be demonstrative of an intent to annoy, abuse or oppress, where, as in this case, those calls were repeated after Plaintiffs advised Defendant that they wished only to be contacted in writing, desired to have the autodialer to stop placing calls to their phones or that future communications were to be with their attorney." 2011 WL 5359698 at *4. Defendant, identifies several cases that it claims have reached the opposite conclusion. For example, in Durthaler v. Accounts Receivable Management, Inc., this Court construed the anti-harassment provision of the Fair Debt Collection Practices Act and clearly did not create a bright line rule requiring that volume of calls was *never* sufficient to demonstrate an intent to harass. 854 F.Supp.2d 485, 489 (S.D. Ohio 2012). Instead, the court held that the 30 calls placed in 73 days that case were insufficient, alone, to demonstrate such an intent. Id. The court is clear that other circumstances could demonstrate an intent to harass, but it did not hold that such other circumstances were necessary. Id. at 491-92. Similarly, here, the Court will not impose a bright line rule that under Colorado law an intent to harass cannot be demonstrated by the evidence, available here, regarding the volume, timing, and frequency of calls. A jury could reasonably find that in making over 300 calls to plaintiffs–including 8 calls per day on many occasions–demonstrates an intent to harass under the Colorado Uniform Consumer Credit Code and that it would cause extreme mental anguish in a person of ordinary sensibilities.

**IV. Claims Related to the Payment Assurance Plan**

The parties vigorously disagree regarding whether Pariscoff was enrolled in the Chase Payment Assurance Plan and whether he was entitled to plan coverage. Each side provides some evidence for two meaningfully different stories. Plaintiff has testified and provided a declaration asserting that sometime while he was still employed, he entered into an oral contract with Chase in which it offered a payment assurance plan that would cover his payments in the event of involuntary unemployment. Doc. 34-2 ¶ 1. "I accepted the offer on the call, authorizing the representative to add the premium to my account on a monthly basis. I was never told that I had to remain employed for any period after enrollment, nor did I soon thereafter receive any conditions either orally or in writing. Knowing my job was fragile, I happily agreed to the offer." Doc. 34-2 ¶ 1. In addition to Pariscoff's testimony and declaration, a document submitted by Chase could support Pariscoff's claim that an oral contract existed. On May 5, 2009, Chase apparently mailed Pariscoff a "Chase Payment Assurance Purchase Form." See doc. 29-1 at 88. Though it was sent in May and signed by Pariscoff in July, it lists a "Plan Effective Date" of February 18, 2009. Doc. 29-1 at 88. It is unclear why Chase would send Pariscoff a form to purchase insurance in May with an activation date in February. Confusion surrounding this document tends to support plaintiffs' assertion that an oral contract existed between Chase and Pariscoff.

Defendant presents evidence of a different story. Chase denies that the call in which Pariscoff claims to have accepted payment assurance ever occurred. Doc. 43 at 23-24. It also presents evidence that when Pariscoff subsequently attempted to enroll, he was ineligible for payment assurance and never made any payments on the plan, resulting in its cancellation.

The facts presented by the parties are mutually inconsistent. Both cannot be true, but both are supported by some evidence. Pariscoff's conversion claim, and to some extent his Consumer

Credit Code claim, rest on his argument that he was enrolled in payment assurance, was not in default on his loan, and thus Chase improperly attempted to collect on the loan and repossessed the automobile. Pariscoff has presented some evidence that he was enrolled in the payment assurance plan, and if credited by a jury, that evidence could support his claims. At this stage, the Court must construe the plaintiff's evidence in a most favorable light and may not weigh evidence or make credibility determinations.

It is worth noting that significant questions remain regarding the oral contract theory presented by plaintiffs. Defendant argues only that Pariscoff has not presented sufficient evidence that he was validly enrolled in the payment assurance plan. But the parties have not raised the issue, and the Court cannot determine on the current record, whether the oral contract as described by plaintiff is enforceable against Chase.

**V.    Preemption by the National Bank Act**

Finally defendant argues that all of plaintiffs' claims arise under state law that is preempted by the National Bank Act, 12 U.S.C. § 1, *et seq*. This act "shields national banks from unduly burdensome and duplicative state regulation." Watters v. Wachovia Bank, N.A., 550 U.S. 1, 11 (2007). "In general, a federal law may preempt a state law in any of the following three scenarios. First, a federal statute may expressly preempt the state law. Second, a federal law may impliedly preempt a state law. Third, preemption results from an actual conflict between a federal and a state law." Garcia v. Wyeth-Ayerst Labs., 385 F.3d 961, 965 (6th Cir. 2004) (citations omitted). Here, it appears that defendant argues that the National Bank Act engages in field preemption, impliedly preempting states from regulating in the field of debt cancellation contracts. Field preemption occurs "if federal law so thoroughly occupies a legislative field 'as to make reasonable the inference that

14

Congress left no room for the States to supplement it.'" Cipollone v. Liggett Group, Inc., 505 U.S. 504, 516 (1992) (quoting Fidelity Fed. Sav. & Loan Assn. v. De la Cuesta, 458 U.S. 141, 153 (1982)). Defendant argues that the National Bank Act has entirely occupied the field of debt cancellation agreements offered by national banks. Doc. 29 at 16. The Act does *allow* national banks to offer such agreements by granting them "all such incidental powers as shall be necessary to carry on the business of banking; by discounting and negotiating promissory notes, drafts, bills of exchange, and other evidences of debt . . . ." 12 U.S.C. § 24 (Seventh).

It is not clear how this general grant of power to banks supports defendant's assertion that "all state law claims relating to or stemming from allegations challenging a debt cancellation contract, like Chase Payment Assurance, are preempted by federal law. Regulations promulgated by the Comptroller of the Currency do suggest broad preemption of state law in the field of debt cancellation contracts: "This part applies to debt cancellation contracts and debt suspension agreements entered into by national banks in connection with extensions of credit they make. National banks' debt cancellation contracts and debt suspension agreements are governed by this part and applicable Federal law and regulations, and not by . . . state law." 12 C.F.R. § 37.1. However, the government of debt cancellation contracts offered by part 37 of Title 12 is limited. It does not cover the formation of contracts involving debt cancellation contracts or acceptable debt collection practices that banks may use against customers of debt cancellation contracts. Other regulations spell out in greater detail what types of state laws are and are not preempted by the National Bank Act. The regulation defining the scope of National Bank Act preemption protects national banks making non-real estate loans from the need to comply with "state law limitations concerning: . . . licensing, registration . . . , filings or reports by creditors; . . . Loan-to-value ratios; . . . terms of

15

credit" and more.  12 C.F.R. § 7.4008(d).  However, the same regulation includes a savings clause that saves another group of state laws from preemption:

> State laws that are not preempted.  State laws on the following subjects are not inconsistent with the non-real estate lending powers of national banks . . . :
>     (1) Contracts;
>     (2) Torts;
>     (3) Criminal law;
>     (4) Rights to collect debts;
>     (5) Acquisition and transfer of property;
>     (6) Taxation;
>     (7) Zoning; and
>     (8) Any other law that the OCC determines to be applicable . . . .

12 C.F.R. § 7.4008(e).  The laws implicated here, that defendant argues are preempted, plainly fall within the savings clause.  Plaintiffs causes of action for violation of the Colorado Uniform Consumer Credit Code, invasion of privacy, and conversion, plainly are state laws on the subjects of torts, rights to collect debts, and acquisition and transfer of property.

Though the parties have identified no binding case law on the subject, this result is consistent with the results reached by other courts.  For example, in Aguayo v. U.S. Bank, the Ninth Circuit held that California automobile repossession notification rules were not preempted because "debt collection, and specifically the right to repossess property that is the subject of a secured transaction, has deep roots in common law and remains a fixture of state, not federal, law."  653 F.3d 912, 923 (9th Cir. 2011).

The cases identified in defendant's motion for summary judgment do not compel a different result.  The preemption at issue in First National Bank of Eastern Arkansas v. Taylor is quite different.  There, the Eighth Circuit held that a state official could not prevent national banks from offering debt cancellation contracts that federal law allowed.  907 F.2d 775, 777 (8th Cir. 1990).  In Denton v. Department Stores National Bank, the Western District of Washington found a claim

16

based on a state consumer protection statute to be preempted because it would have imposed on a national bank "unduly burdensome and duplicative state regulation." No. C10-5830RBL, 2011 WL 3298890 (W.D. Wash. Aug. 1, 2011).  Here, however, plaintiffs do not seek to require Chase to impose some duty to take affirmative action that might differ from state to state, but to refrain from certain types of collection activities.  Any argument that such state regulation is preempted is severely undercut by the savings clause discussed above.  Finally, in both <u>Spinelli v. Capital One Bank</u>, 265 F.R.D. 598 (M.D. Fla. 2009), and <u>Hawaii, ex rel. Louie v. JP Morgan Chase & Co.</u>, No. 12-00263, 2012 WL 6019709 (D. Haw. Nov. 30, 2012), the courts found preemption where the disputes were over the terms of debt cancellation programs–unlike the laws at issue here, state laws regarding terms of credit are explicitly preempted by 12 C.F.R. § 7.4008(d).

**VI.  Conclusion**

Based on the foregoing reasons, the defendant's motion for summary judgment (Doc. 29) is DENIED.

**VII. Other Motions**

Plaintiffs have moved to file a surreply in opposition to defendant's motion for summary judgment. Doc. 44. In response, defendant moves to strike plaintiffs' motion because it is "a thinly-veiled argument of the points that might have been contained in the proposed surreply . . . ." Doc. 45 at 1. Because the Court here denies defendant's motion for summary judgment, plaintiffs' motion to file a surreply is DENIED as moot.  Defendant's motion is also DENIED.  Though defendant may be correct that plaintiffs have not shown good cause to file a surreply, it has offered no argument as to why it is necessary to strike the motion, rather than simply deny it.

IT IS SO ORDERED.

                                                  S/ James L  Graham  
                                                  James L. Graham  
                                                  UNITED STATES DISTRICT JUDGE

Date: July 16, 2013